COURT OF APPEALS
DECISION
DATED AND FILED

April 2, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2024AP1554**

STATE OF WISCONSIN

Cir. Ct. No.  2022ME115

IN COURT OF APPEALS
DISTRICT II

IN THE MATTER OF THE MENTAL COMMITMENT OF J.M.

WINNEBAGO COUNTY,

PETITIONER-RESPONDENT,

V.

J.M.,

RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Winnebago County: MICHAEL S. GIBBS, Judge. *Affirmed*.

¶1 GUNDRUM, P.J.[1] J.M., referred to herein by the pseudonym James Moore, appeals from circuit court orders extending his involuntary commitment pursuant to WIS. STAT. § 51.20 for twelve months and allowing for the involuntary administration of medication and treatment during that time. He asserts Winnebago County (the County) did not present sufficient evidence at the final hearing to support the orders. For the following reasons, we disagree and affirm.

## Background

¶2 At the final hearing on the County's recommitment petition, the following evidence was presented.

¶3 Kirk Kaufman, a psychiatric care supervisor at Wisconsin Resource Center (WRC), testified that he had known Moore for over twenty years and had observed him both on and off of psychotropic medication. When Moore is "off" of medication, his "thoughts are much more disorganized, his behavior becomes more inappropriate, harder to manage on an open unit, often gets himself in trouble, gets sent to high management, things like that." To get sent to "high management," the "segregation unit," Kaufman testified, it takes "[d]isruptive behavior, threats to staff, causing a climate issue on the unit." When Moore is "on" medication, "[h]e's typically much calmer, much more appropriate, less manicy, follows the rules much better, easier to talk to."

¶4 Jenna Nelson, a psychologist at WRC, testified to knowing Moore "on and off on our unit" since 2020 and being assigned "as a covering

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

psychologist for him" in December 2023. She had seen Moore seven times in the approximately four months between the time she was assigned to him and the final hearing. She opined that Moore has "[s]chizoaffective, bipolar type" mental illness, which she agreed manifests as a substantial disorder of thought, mood, and perception that grossly impairs Moore's judgment, behavior, capacity to recognize reality, and his ability "to meet the ordinary demands of life."

¶5 Nelson explained that Moore exhibited symptoms of "elevated" states, which Moore described as just being "hyper," depressive states, which he "identif[ied]" with, "beliefs that do not appear based in reality," rapid speech, agitation, and a thought process that "is, like, circumstantial, not organized and flowing in a fluid motion," which is "something we see in psychosis where … he's sharing information that's maybe irrelevant to what's being discussed at the time." As to the depressive state Moore manifests at times, she indicated he would express feelings of hopelessness that have "led to feeling suicidal."

¶6 When asked if anything from her review of Moore's treatment record has caused her concern that his mental illness might make him a danger to himself or others, Nelson responded:

> Most recently they've been needing to regulate his water restriction or water intake. He has psychogenic polydipsia, which is a medical diagnosis … that he drinks too much water and becomes a danger to himself. His insight into this illness is not there. He denies this as a concern … [and] doesn't feel that he needs that water restriction.

¶7 Nelson also testified to speaking with Moore regarding the importance of taking medication, and she stated that he

> believes he … benefits from medication for depression and feelings of paranoia. He denies repeatedly that he needs medications for mania. He states he's just hyper. He states

> he would take the medications if there was not an order in place.
>
> We then reviewed, though, his history dating back of him on and off of medications. He's … had commitments without medication orders where they … shortly thereafter need to come back for a medication order to be added due to decompensation. We reviewed the behaviors of his decompensation including when he becomes psychotic and manic, and he denies this as he does not agree with the decompensation.

Nelson agreed that Moore "lose[s] volitional control over his thoughts and actions when he's not medicated," adding that "looking at the history, that's where those additional court hearings occur of needing to add that medication order because he's unable to address his mental health."

¶8      When asked about any occasions "within the past three months" in which Moore had refused medication, Nelson responded

> Just this week he refused an oral medication … for his depressive thoughts. He stated that … he was depressed and didn't want to take it. He was encouraged to take it; … what he's sharing with me is the exact indication of why he would need this. This is not a medication that can be forced. It's an oral pill that he would need to take voluntarily. So just this week alone we've noticed this.

She agreed that Moore "lack[s] insight," adding

> while he is able to state what his diagnoses are, looking at the long-term treatment, he does not understand that part of it. He sees the benefits to treat the depressive states, but he actually has expressed liking the manic states, which is a common thing that we see with individuals that do experience mania.

¶9      On cross-examination, Nelson indicated Moore has been diagnosed with schizoaffective disorder "for several years" and added that "[h]is symptoms are congruent with that" diagnosis. She agreed the symptoms she has personally observed "would have been while [Moore] was on a commitment with a

medication order." She stated that Moore had expressed to her his displeasure with side effects of the medications he was taking, including "tardive dyskinesia as well as his belief that the medications cause his diabetes." She explained that "tardive dyskinesia" is "involuntary muscle movement; that can be a side effect of medications," noting that she has observed this condition in Moore. Nelson declined to opine on whether Moore's belief that the medications cause his diabetes was "medically sound."

¶10 Through additional re-direct and re-cross-examination, Nelson agreed that Moore's "schizoaffective disorder, bipolar type," is a permanent condition that is "treatable with psychotropic medication" and is also treated with "psychoeducation" and therapy, adding that the therapy is offered "once someone is stabilized on medication."

¶11 Doctor Wilbur Sarino, a staff psychiatrist at WRC, testified that Moore is a patient of his. He also opined that Moore suffers from schizoaffective disorder and agreed he is treatable with psychotropic medications and that the medication he has prescribed to Moore will have therapeutic value for him. Sarino confirmed he had explained to Moore "the advantages, disadvantages, and alternatives of accepting medication and treatment," including explaining these with regard to each of the medications Moore is currently on, those being "Prolixin, … Decanoate[,] … Klonopin and also venlafaxine." Sarino explained to Moore that advantages of the medication include "[s]tabilization of mood, reduction of psychosis and paranoia," disadvantages include "sedation, weight gain, abnormal[/involuntary] movement problems." Sarino indicated Moore is not capable of "applying an understanding of those advantages, disadvantages, and alternatives to himself in treating his condition" or "expressing an understanding

of the advantages, disadvantages, and alternatives of accepting medication and treatment." As to applying an understanding, Sarino expounded that Moore

> feels that being under commitment is in retaliation … of mood. He does not believe he suffers from any schizoaffective disorder. He believes he only has anxiety and hyperactivity. I asked him, during my last meeting with him, given that he has a history of refusing medications, if he will comply if commitment were withdrawn, he said, no, he will not take medications.

¶12 Sarino detailed for the circuit court the therapeutic value of the medications, explaining that "[w]ithout medications, [Moore] is described [as] talking gibberish, very manic, [and] very agitated." He added that since he "took over [Moore's] care in December [2023], I've seldom seen that as often."

¶13 Considering his own examinations of Moore and review of Moore's treatment records, Sarino discussed times when Moore decompensated when not on medication.

> The review of records would indicate initial commitment dating back to 2011, and sometimes he will be committed without a medication order, only for the provider to return back to court and be granted a medication order a few months later. I believe this occurred in 2015 and 2017.
>
> In 2021, his commitment was dismissed by the [c]ourt, I believe, in July. By November of that same year, we had to seek a Chapter 51 commitment again.

Sarino agreed that if Moore is not committed, he will decompensate without treatment, adding that "this has been shown by prior histories of refusing medications only … for recommitment to be pursued." Sarino indicated that "going untreated" would cause Moore "severe emotional, physical, or psychological harm."

¶14 Sarino agreed that Moore also suffers from psychogenic polydipsia, caused by his mental illness, and added that Moore relatedly "was admitted to a local hospital a month or two back for low sodium."

¶15 On cross-examination, Sarino acknowledged that when he had personally observed Moore speaking gibberish, it was approximately three months prior to the hearing, a time when Moore was under commitment with an involuntary medication order.

¶16 Sarino's "Report of Examination" related to his February 20, 2024 examination of Moore was admitted into evidence without objection. The report indicates, inter alia, that "[c]ommitment was initiated for [Moore] in 2011 and 2021. Extensions have been granted in the past. Involuntary medications have been granted due to poor compliance." It states Moore has impaired judgment and "poor insight [in]to his condition." Specifically related to Moore's dangerousness, Sarino wrote:

> Feb 2023- inappropriate behavior with female staff.
>
> May 2023- episode of hyponatremia (low sodium). He was placed on fluid restriction. Admitted to local hospital.
>
> December 2023- Cussing at staff. [Moore] was challenging that a suit up team be assembled. A week later, he was accusing staff of being liars and racists.
>
> January 2024- episode of hyponatremia brought about by polydipsia.
>
> Feb. 5, 2024- screaming at staff.
>
> Feb. 12, 2024- threatened to kill a peer, calling him derogatory names.
>
> Feb. 16, 2024- sent to ER for low sodium.

7

¶17    Sarino indicated in the report that "medication or treatment [would] have therapeutic value for [Moore]" and that he explained the advantages ("[r]eduction of paranoia, mood stabilization, improved thought process"), disadvantages ("[i]nvoluntary movements, weight gain, elevated cholesterol/glucose"), and alternatives ("[o]ther anti-psychotic medications[,] [i]ndividual/group therapy") of the recommended medication/treatment to Moore. Sarino also indicated that due to Moore's mental illness, Moore is "incapable of expressing an understanding of the advantages, disadvantages and alternatives to accepting the recommended medication or treatment," adding that Moore "demands to be taken off medication. He has been refusing a second mood stabilizer." Sarino additionally indicated Moore is "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his … condition in order to make an informed choice as to whether to accept or refuse the recommended medication or treatment," adding that Moore "disputes being under commitment. [He] displays disorganized thought process."

¶18    The circuit court concluded extension of Moore's commitment and continued involuntary medication were appropriate, and it so ordered. Moore appeals.

## Discussion

*Order Extending Commitment*

¶19    An individual is a proper subject for recommitment under WIS. STAT. § 51.20(1) if the County proves by clear and convincing evidence that the individual is mentally ill, a proper subject for treatment, and dangerous to himself or others. *See **Langlade County v. D.J.W.***, 2020 WI 41, ¶31, 391 Wis. 2d 231, 942 N.W.2d 277; § 51.20(1)(a), (13)(e). Of these three, Moore only challenges

the circuit court's determinations that he is dangerous and a proper subject for treatment.

¶20 Whether the County met its burden of proof to support Moore's recommitment order presents a mixed question of law and fact. *See Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. "[W]e will uphold a circuit court's findings of fact unless they are clearly erroneous," *D.J.W.*, 391 Wis. 2d 231, ¶24, and "we accept reasonable inferences from the facts," *Winnebago County v. Christopher S.*, 2016 WI 1, ¶50, 366 Wis. 2d 1, 878 N.W.2d 109 (citation omitted). Whether the facts satisfy the statutory standard, however, is a question of law we review independently. *D.J.W.*, 391 Wis. 2d 231, ¶¶25, 47; *Outagamie County v. Melanie L.*, 2013 WI 67, ¶39, 349 Wis. 2d 148, 833 N.W.2d 607. On appeal, Moore has the burden to show that the circuit court erred. *See Gaethke v. Pozder*, 2017 WI App 38, ¶36, 376 Wis. 2d 448, 899 N.W.2d 381.

*Dangerousness*

¶21 Moore contends there was insufficient evidence presented to support the circuit court's determination that he is dangerous under the standards of WIS. STAT. § 51.20(1)(a)2.a.-e. Because we conclude the evidence supports the court's determination that Moore met the dangerousness standard of § 51.20(1)(a)2.c., the third standard, we need not consider the other standards. *See Sauk County v. S.A.M.*, 2022 WI 46, ¶5, 402 Wis. 2d 379, 975 N.W.2d 162 ("If the government presents clear and convincing evidence that the committed person remains mentally ill, treatable, and dangerous under one of the five standards … then the court must order that person recommitted ….").

¶22   An individual is dangerous under the third standard if he or she "[e]vidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself or other individuals." *See* WIS. STAT. § 51.20(1)(a)2.c. The County showed that here.

¶23   Nelson testified Moore is diagnosed with psychogenic polydipsia, which is a condition that causes a person to drink excessive amounts of water, and he recently needed to have his water intake regulated because he drinks too much "and becomes a danger to himself." She added that his "insight into this illness is not there. He denies this as a concern." Sarino agreed that Moore's psychogenic polydipsia is caused by his mental illness and stated that this condition resulted in Moore being "admitted to a local hospital a month or two back for low sodium." Sarino further detailed in his report that in May 2023, Moore suffered an "episode of hyponatremia (low sodium)" and was "placed on fluid restriction [and] [a]dmitted to local hospital." In January 2024, Moore had another "episode of hyponatremia brought about by polydipsia." And, on February 16, 2024, less than two months before the hearing in this case, he was "sent to ER for low sodium."

¶24   While the County could have done better to tease out additional details related to the extent of harm psychogenic polydipsia can lead to, the above evidence satisfies the third standard of dangerousness. The trips from prison to the hospital, particularly the ER, allow for the reasonable inference that because of Moore's excessive water intake caused by his mental illness, "there is a substantial probability of physical impairment or injury to himself." *See* WIS. STAT. § 51.20(1)(a)2.c. As Nelson flatly stated, he "becomes a danger to himself." With his lack of "insight into this illness," denial it is a concern, failure to safely regulate himself, and three low sodium episodes in nine months, two of which

10

required hospitalization, Moore "[e]vidence[d] such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself …." *See **id.***

*Proper Subject for Treatment*

¶25    Moore also asserts "[t]he County did not prove [he] is a proper subject for treatment." We disagree.

¶26    In the WIS. STAT. ch. 51 context, "[t]reatment" "comprises 'those psychological, educational, social, chemical, medical or somatic techniques *designed to bring about rehabilitation* of a mentally ill, alcoholic, drug dependent or developmentally disabled person.'" ***J.W.J.***, 375 Wis. 2d 542, ¶21 (emphasis added) (citing WIS. STAT. § 51.01(17)). Our supreme court has further stated that "if treatment will go beyond controlling activity and will *go to* controlling the disorder and its symptoms, then the subject individual has rehabilitative *potential*, and is a proper subject for treatment." ***Id.***, ¶¶23, 36 (emphases added) (citing ***Fond du Lac County v. Helen E.F.***, 2012 WI 50, ¶36, 340 Wis. 2d 500, 814 N.W.2d 179). The ***J.W.J.*** court clarified that "rehabilitation is not synonymous with cure," ***J.W.J.***, 375 Wis. 2d 542, ¶32, but referred to improving the condition of the patient by lessening the significance of symptoms and behaviors of concern, ***id.***, ¶¶36, 38. "The key is that the rehabilitative treatment addresses itself to the symptom, not ... activities." ***Id.***, ¶34 n.15. In this case then, if treatment "go[es] to" controlling Moore's disorder, symptoms and/or behaviors, then he is considered to have "rehabilitative potential" and be a "proper subject for treatment." *See **id.***, ¶¶23, 36.

¶27    At the final hearing on Moore's commitment extension, Dr. Nelson opined that Moore suffers from the mental illness of "[s]chizoaffective, bipolar

11

type," which she agreed manifests itself as a substantial disorder of thought, mood, and perception that grossly impairs his judgment, behavior, capacity to recognize reality, and his ability "to meet the ordinary demands of life." Nelson explained that Moore exhibits "elevated" states and depressive states, beliefs "that do not appear based in reality," rapid speech, agitation, and a thought process that "is, like, circumstantial, not organized and flowing in a fluid motion," adding with regard to the latter, that "he's sharing information that's maybe irrelevant to what's being discussed at the time." Related to his depressive state, Moore would express feelings of hopelessness that have "led to feeling suicidal." She testified regarding Moore's psychogenic polydipsia, which causes Moore to "drink[] too much water and become[] a danger to himself." Nelson agreed that Moore "lose[s] volitional control over his thoughts and actions *when he's not medicated*," adding that when he is not medicated, "he's unable to address his mental health." (Emphasis added.) The obvious and reasonable inference from this latter testimony, of course, is that Moore has better control over his thoughts and actions and is able to better address his mental health when he is medicated. While Nelson agreed that Moore's "[s]chizoaffective disorder, bipolar type" is a permanent condition, she also agreed it is a condition that is "treatable" with psychotropic medication, psychoeducation and therapy.

¶28 Doctor Sarino also opined that Moore suffers from schizoaffective disorder, which Sarino also agreed is treatable with psychotropic medications. He stated that the medication he has prescribed for Moore has therapeutic value for him, detailing that without medications, Moore talks "gibberish" and is "very manic, very agitated," adding that he has "seldom seen that as often" in Moore since he took over as Moore's psychiatrist in December 2023. Sarino agreed Moore would decompensate without treatment, resulting in "severe emotional,

physical, or psychological harm." He added, based on his review of Moore's treatment records, that "there [have] been periods of time in which [Moore] decompensated when he was not on medication," noting that in years past "sometimes he will be committed without a medication order, only for the provider to return back to court and be granted a medication order a few months later. I believe this occurred in 2015 and 2017." He also noted that "[i]n 2021, his commitment was dismissed by the [c]ourt, I believe, in July. By November of that same year, he had to seek a Chapter 51 commitment again."

¶29 We conclude Moore has not met his appellate burden to demonstrate that the circuit court erred in determining he is a proper subject for treatment. The question to us is whether the treatment, in this case the medication in particular, "go[es] to"/"addresses itself to" controlling or improving Moore's schizoaffective disorder, its symptoms, and/or related behaviors, thus indicating that Moore has "rehabilitative potential." *See **J.W.J.***, 375 Wis. 2d 542, ¶¶23, 34 n.15, 36. While the County certainly did not produce evidence that medications or other treatment control all aspects of Moore's schizoaffective disorder, symptoms and/or behaviors, it did produce evidence that medication prescribed by Sarino "go[es] to"/"addresses itself to" controlling the disorder and lessening the significance of concerning symptoms and behaviors. Between the two doctors and the psychiatric care supervisor, they presented evidence that Moore is better able to control his thoughts and actions and address his mental health when medicated and that medications improve his thinking and communication by lessening his "gibberish" and improve his control related to "very manic, very agitated" states. While the County sliced the salami thinly with the evidence presented, it still made a sandwich such that there was sufficient evidence to support the determination that Moore has rehabilitative potential and is a proper subject for treatment.

*Involuntary Medication Order*

¶30    Lastly, Moore contends "the involuntary medication order is unlawful because the County did not prove that [Moore] was incompetent to refuse medications." Again, we disagree.

¶31    "[U]nder WIS. STAT. § 51.61, a person has the right to refuse medication unless a court determines that the person is incompetent to make such a decision." *Melanie L.*, 349 Wis. 2d 148, ¶53. "[T]he County bears the burden of proof on the issue of competency in a hearing on an involuntary medication order," *id.*, ¶94, and, as relevant here, establishes a person's incompetency to refuse medication by proving by clear and convincing evidence that due to mental illness

> and after the advantages and disadvantages of and alternatives to accepting the particular medication ... have been explained to the individual, one of the following is true:
>
> a. The individual is incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives.
>
> b. The individual is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his ... mental illness ... in order to make an informed choice as to whether to accept or refuse medication or treatment.

*See* § 51.61(1)(g)3., 4.; WIS. STAT. § 51.20(13)(e).

¶32    In his testimony, Sarino agreed Moore is incapable "of applying [to his condition] an understanding of th[e] advantages, disadvantages, and alternatives" of the medications prescribed by Sarino. Asked for examples on this point, Sarino stated that Moore "does not believe he suffers from any schizoaffective disorder" and instead believes he is "under commitment … in

retaliation of mood" and that he "only has anxiety and hyperactivity." During his last meeting with Moore, Sarino testified, he asked Moore "given that he has a history of refusing medications, if he will comply if commitment were withdrawn," to which Moore responded, "no, he will not take medications." In his report admitted into evidence, Sarino indicated Moore's judgment is impaired and he has "poor insight [in]to his condition." Sarino agrees in the report, using the WIS. STAT. § 51.61(1)(g)4. language, that because of Moore's mental illness, he is "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his … condition in order to make an informed choice as to whether to accept or refuse the recommended medication or treatment." Relatedly, Sarino adds that Moore "disputes being under commitment [and] displays disorganized thought process."

¶33 Moore points out that Nelson testified that Moore "states he would take the medications if there was not an order in place." He claims this testimony is in opposition to Sarino's as "to [Moore's] competency to refuse medication and whether he would continue taking medication if not court ordered." Moore's development of this argument is thin, stating only that the "conflict[]" in testimony is "concerning" and that Nelson's testimony here "demonstrates an understanding and ability to apply" the advantages, disadvantages and alternatives to his mental illness by Moore.

¶34 While Moore cherry picks portions of the testimony favorable to him, we note Nelson also testified to Moore refusing an oral medication just days prior to the hearing. The particular medication, Nelson stated, was "for his depressive thoughts. He stated that … he was depressed and didn't want to take it," despite being encouraged to do so. She explained that "what he's sharing with me is the exact indication of why he would need this." In her next comment,

Nelson agreed that Moore appears to "lack insight," adding that "while he's able to state what his diagnoses are, looking at the long-term treatment, he does not understand that part of it."

¶35    Considering the totality of the hearing evidence, we conclude the circuit court did not err in determining, as it indicated in its "Order for Involuntary Medication and Treatment," that Moore is "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his … condition in order to make an informed choice as to whether to accept or refuse psychotropic medications."

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.